[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
This case is before us on the appeal of Michael Robinson from the Final Judgment and Decree of Divorce filed by the trial court on May 28, 1997. In his brief, Robinson raises eleven assignments of error. Rather than list them in order now, we will refer to each separately when discussing the merits of Mr. Robinson's arguments.
As a preliminary matter, we note that Michael and Julia Robinson were married on October 17, 1987, and have three children. At the time of the final divorce hearing, the children were ages 8, 6, and 4. Before separating on March 15, 1995, the parties had accumulated substantial assets as a result of Michael's position with National Cash Register (NCR) Corporation. By contrast, Julia was a homemaker during the marriage and stayed home with the children. Additional factual matters, as pertinent, will be mentioned during our discussion.
 I
In the first assignment of error, Michael claims that the trial court abused its discretion and decided against the manifest weight of the evidence in awarding Julia one-half of a $94,000.00 Merrill Lynch municipal bond fund. According to Michael, the bond fund was not marital property, but was Michael's separate property. As support for this claim, Michael points to his own testimony that the money in the bond fund came from an inheritance Michael received in 1992. As further evidence of the fund's character as separate property, Michael relies on his own testimony that he did not intend the fund as a "gift" in the event of divorce. He also relies on Julia's failure to contradict his testimony, and on Julia's alleged acknowledgment in Exhibits M and O that the bond fund was Michael's separate property
We begin with the established concept that "[i]n reviewing the trial court's decision to divide the marital property, we must determine, after considering the totality of the circumstances, whether the trial court abused its discretion. Helton v. Helton
(1996), 114 Ohio App.3d 683, 685 (citations omitted). Abuse of discretion means "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219. Furthermore, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C. E. Morris Co. v. FoleyConst. Co. (1978), 54 Ohio St.2d 279.
After reviewing the evidence in this case, we cannot find that the trial court acted arbitrarily or unreasonably in awarding Julia one-half of the municipal bond fund. In Helton, we recognized that separate property can be transformed into marital property by actions during marriage, but that "the holding of title to property, even by both spouses in a form of co-ownership, does not, by itself, determine whether the property is marital property." 114 Ohio App.3d at 686 (citations omitted). Thus, inHelton, we found additionally persuasive the fact that the husband had not only added his wife's name to property inherited after marriage, but had also intended to provide for his wife in the event of his death. Similarly, in Kahn v. Kahn (1987),42 Ohio App.3d 61, we emphasized that the source of funds is not necessarily determinative, but should be considered along with other relevant factors.
In the present case, Michael's testimony that he put the bond fund in Julia's name to protect her in the event of his death and for purposes of estate planning would be sufficient evidence to sustain the trial court's decision. As we noted in Helton, "`[t]he fact that the affection that may have existed at the time of the conveyance has vanished does not nullify the conveyance that was made at that time.'" Id. at 687 (citation omitted). In this context, we see no distinction between the circumstances of this case and those in Helton. Moreover, other testimony from Michael emphasizes donative intent, as Michael stated that Julia's name was added to the bond fund not only for estate planning purposes, but also at the suggestion of a marriage counselor, in 1992, to show "trust, good will, and faith." At that time, Michael also placed other property in Julia's name.
Furthermore, characterizing Exhibits M and O as an acknowledgment by Julia of the bond fund as separate property is not an accurate reflection of the testimony about those documents. To the contrary, Exhibit M is a document prepared by Michael and given to Julia's attorney in 1995, before the divorce was filed. The exhibit has numerous pages of financial information, including page 20, which discusses a bond fund in the amount of approximately $69,275.36. Exhibit O was also prepared by Michael, and discusses a bond fund in the amount of $94,039.38
Julia did not mention Exhibits M or O in her testimony. She did testify about Exhibit N, which appears to be an updated version of page 20 of Exhibit M, showing a value for the bond fund of $80,303.01. Thus, there were two bond funds, one in the amount of $94,039.38 (which the trial court found to be marital property), and the other in the amount of $80,303.01 (which the trial court found to be Michael's separate property).
In both exhibits M and N, Michael labeled the $80,303.01 bond fund as "Michael G. and Julia A. Robinson — Retirement Savings — Tax Free Municipal Bonds." Under "Name and Tax Liability," Michael listed the names of Julia and Michael Robinson, along with the account number. Concerning this account, Julia testified that Michael told her this was money they were saving for their retirement or in case something happened to him. She also testified that Michael told her the account belonged to her. Michael's own testimony was that this account was in his name only and that no contributions were made to the account during marriage, other than money his brother paid him for a pre-marital debt after their mother died in 1992.
No documentary evidence was submitted concerning this account, i.e., no statements from Merrill Lynch were submitted to show the actual name on the account. However, the fact that Michael listed the account as a retirement account for both he and Julia and also listed both their names on the account on Exhibit M supports Julia's trial testimony that the account was a marital asset. Significantly, Exhibit M was prepared at a time when the parties were contemplating divorce, but yet does not list the bond as a separate asset. In finding the fund to be separate property, the trial court relied on the fact that the fund was in Michael's name and that no contributions had been made during marriage. However, Julia did not appeal the decision of the trial court that the $80,303.01 Merrill Lynch account was separate property.
As was noted previously, Julia did not testify about Exhibit O, which discusses the $94,039.38 Merrill Lynch bond fund. Again, Exhibit O was a document prepared by Michael. On Exhibit O, Michael characterized the $94,039.38 bond account as follows: "Michael G. and Julia A. Robinson — Children's College Fund." Michael listed both his and Julia's names on Exhibit O under "Name Tax Liability."
In addition, he testified that this bond account was in both names. As with the other bond account, the exhibit supports Julia's trial testimony, which was that this account was placed in both their names to make sure that the children had money for college. As was noted above, Michael's testimony was also that this fund was placed in Julia's name for estate planning purposes, so she would have access to the fund if something happened to him.
Under the circumstances, the trial court could have concluded that both funds were transformed into marital assets. Instead, the court found only that the $94,039.38 bond fund was a joint asset, and awarded only one-half of that fund to Julia. Given the state of the evidence, we cannot find that the trial court abused its discretion, nor can we find the award against the manifest weight of the evidence. Accepting Michael's position would mean that no asset could ever become joint property, since no one would testify, in hindsight, that an asset was intended to belong to an ex-spouse in the event of divorce. Our decisions in the past have rejected a formulaic transformation of property into joint assets based simply on title. See, Helton, 114 Ohio App.3d at 686. We agree fully with that proposition, and likewise decline to adopt a standard that would automatically exclude property as marital based on after-the-fact claims that the property was not intended to belong to a spouse upon divorce. Accordingly, the first assignment of error is without merit and is overruled.
 II
In the second assignment of error, Michael claims that the court abused its discretion and decided against the weight of the evidence in ordering Michael to "equalize" the disproportionate division of assets by paying cash to Julia rather than by transferring assets to her. In reviewing this assignment of error, we are again guided by the standards set forth above concerning abuse of discretion and manifest weight of the evidence.
As we indicated above, the parties accumulated substantial assets during their marriage. After dividing the assets, the trial court awarded Michael the residential property he had requested, and found that Julia was entitled to $180,367.00 as her share. The court did not make an order concerning how Michael should satisfy his obligation. However, Michael contends that because the only potential means of paying his obligation is through liquidation of assets, the trial court erred in not considering the tax consequences of the liquidation. Michael further claims that by failing to consider the tax consequences, the trial court, in effect, awarded Julia more than one-half the assets.
R.C. 3105.171 (F) provides that in making a division of marital property and in determining whether to make any distributive award, the court shall consider the following factors:
(1) The duration of the marriage;
(2) The assets and liabilities of the spouses;
 (3) The desirability of awarding the family home, or the right to reside in the family home for reasonable periods of time, to the spouse with custody of the children of the marriage;
(4) The liquidity of the property to be distributed;
 (5) The economic desirability of retaining intact an asset or an interest in an asset;
 (6) The tax consequences of the property division upon the respective awards to be made to each spouse;
 (7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property;
 (8) Any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses;
 (9) Any other factor that the court expressly finds to be relevant and equitable.
Although the trial court is required to consider tax consequences when dividing assets, we have said that speculative consequences need not be considered. James, (1995), 101 Ohio App.3d 668, 688. In James, we rejected a claim similar to the one being made in the present case. Specifically, we found that the trial court did not require specific assets to be liquidated, but instead simply made an award, with the choice of how the award should be satisfied being left to the party's discretion. Id.
In this regard, we note that Michael was given the marital residence, with an agreed value of $267,000.00 and a mortgage balance as of the hearing date of approximately $150,000.00. Additional marital assets awarded to Michael included: one half of the $94,039.38 Merrill Lynch bond fund; ATT stock options valued as of the date of hearing, after exercise of the option and payment of all taxes, in the amount of approximately $57,000; and retirement money from several sources with a present value of well over $100,000 (representing one-half of the retirement money as calculated by Michael at the hearing). As separate property, Michael also was awarded sole ownership of a vacation home valued at a minimum of $150,000.00, with no mortgage or other liens; a one-fourth interest in a tree farm, valued at approximately 164,000.00; and a Merrill Lynch bond fund with a value as of March 15, 1995, of approximately $80,303.01.
Michael had also accumulated additional property since the time of separation, in the form of additional contributions to his retirement plans and stock purchases. For example, approximately $4,283.11 of a $38,000 bonus received by Michael on March 9, 1997, was used to purchase stock options. Also before the trial court was the fact that Michael had no debt at the time of the hearing, other than the existing mortgage on the marital premises.
Based on the evidence before the trial court, numerous alternatives existed for payment of the obligation, including options such as the sale of the marital home or borrowing from the 401(K) account, that would not have resulted in tax consequences. Because the trial court did not specify the means of satisfying the court order, we find no abuse of discretion in the trial court's decision. Consequently, the second assignment of error is overruled.
 III
In the third assignment of error, Michael claims that the court abused its discretion and decided against the weight of the evidence in determining spousal support and the child support obligation. In this context, Michael makes two primary arguments. First, he contends that the trial court used an extraordinary bonus in calculating his income, which resulted in a disproportionate award of support. Second, he claims the trial court erred in failing to attribute income to his wife. We begin, as before, with the premise that the trial court has broad discretion in these areas and its orders will not be disturbed absent abuse of discretion. See, e.g., Tremaine v. Tremaine
(1996), 111 Ohio App.3d 703,706, discretionary appeal not allowed,77 Ohio St.3d 1480, and Houts v. Houts (1995), 99 Ohio App.3d 701,704.
To determine the amount of support, the court used an income figure for Michael of $160,744.00, which represented Michael's annual income at the time of the hearing, including a $38,114.00 bonus Michael received in 1997. The trial court then assessed $2,500.00 in spousal support and $751.00 child support per month per child (which represented an increase over a previous temporary support award of $667.00 per month per child). The court figured that the spousal and child support awards would be 35% of Michael's gross income and 54% of his net income after taxes. Additionally, in the decision, the court mentioned Michael's earlier failure to disclose that he would receive a $38,000 bonus within a few days after the temporary support hearing held on March 17, 1997. Accordingly, the court made the increased child support effective as of April 1, 1997. In calculating gross income, the trial court did not use Michael's income from other sources, including approximately $10,000.00 from the tax-deferred municipal bond accounts, dividend income, and other interest income.
After reviewing the record, we note that the temporary support hearing was held on Monday, March 17, 1997. The $38,114.00 bonus was paid along with Michael's regular pay for the pay period of February 24, 1997, through March 9, 1997. Michael testified that his pay at NCR is in arrears one week and that he received the check the Tuesday after the temporary support hearing, which means he would have received the bonus the day after the temporary support hearing. As was indicated, he did not disclose the anticipated bonus at the support hearing, nor did he disclose it on his amended pretrial statement, which was filed on April 30, 1997, well after receipt of the check. In the amended pretrial statement, Michael included only his annual salary for 1997, as well as salary and bonus amounts for the prior four years. Based on these figures, he asked that child support be calculated on a three-year average income of $131,130.00 per year, or in an amount of $650.00 per month per child.
Child support computations under R.C. 3113.215 are based on a complicated formula that begins with the gross income of parents. Gross income includes "the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable, and includes, but is not limited to, income from salaries, wages, overtime pay and bonuses * * * dividends, severance pay, pensions, interest, trust income, annuities, * * * and potential cash flow from any source." R.C. 3113.215(A)(2). Under the statute, bonuses are to be figured based on the lesser of the yearly average of all bonuses received during the three years immediately before the support obligation is being figured, or the total bonuses received during the year before computation of the support. R.C. 3113.215(B)(5)(D).
In light of the statute's express direction and the agreed salary and bonus figures for 1997, 1996, and 1995, the trial court should have used a three-year average figure of approximately $143,592.00 for salary and bonuses. While the difference in amounts is not substantial, the trial court did err in using only the 1997 year's salary and bonus. As a result, the case must be remanded for recalculation of child support. However, although the child support needs to be recalculated, we find no error in the amount of spousal support.
In addition to arguing that improper bonus amounts were used, Michael claims the spousal support, when considered with the amount of child support, is excessive because he is left with insufficient income to meet his own expenses. We have previously held that "a spousal support award must balance the obligee's need for support against the obligor's ability to pay." Tremaine, (1996), 111 Ohio App.3d 703, 707. "Among many factors a court must consider when determining whether the amount of spousal support is appropriate and reasonable are the income of the parties, the relative earning abilities of the parties, and the extent to which it would be inappropriate for a party, because of being custodian of a minor child of the marriage, to seek employment outside the home." Shaffer v. Shaffer (1996),109 Ohio App.3d 205, 211. Unlike the child support statute, R.C.3105.18 does not discuss bonuses, but indicates that the income of the parties, "from all sources," should be considered. As we indicated above, the trial court did consider Michael's large 1997 bonus, but did not consider interest income nor did the court consider any income from Michael's separate property. For example, Michael testified that the vacation home had generated a cash flow contribution of approximately $35,000.00 and depreciation of approximately $32,000.00 over the past four years.
In the present case, the parties have three small children, one of whom is of preschool age, and the mother has not worked outside the home since the birth of any of the children. By the same token, the father has an excellent income and a far greater earning potential than the mother, who has not been employed in ten years. The trial court also noted that the father chose to live in a five-bedroom house with a mortgage payment of nearly $2,000.00 per month. Under the circumstances, we see no abuse of discretion in the amount of spousal support awarded. As an aside, we note that a number of Michael's arguments also distort the record.
For example, Michael claims that because the trial court ordered him to pay 10% annual interest on the $180,367.00 owed to his wife, he will owe an additional $1,503.00 per month in interest payments. He then uses this figure to argue that even if he receives another $38,000.00 bonus, he will have no money to live on after the child and spousal support is deducted. This argument ignores several pertinent facts. First, as was noted above, more than sufficient assets are available to pay the money that is due. Therefore, no reason exists for incurring any interest charges. Based on the documents prepared by Michael, one bond fund had a value of $80,303.00 on March 29, 1996, and the other had a value of $94,039.38 on December 29, 1995. According to Michael, these funds accrue interest at the rate of almost $10,000.00 per year, and there was no evidence that any funds had been dissipated between the above dates and the hearing in April, 1997. Therefore, each fund should have contained several thousand more dollars in interest by the time of the divorce hearing. However, even using the amounts of the funds in 1995 and early 1996, Michael's share in the funds ($127,322.69) and the after-tax value of the stock options ($57,000.00) would more than satisfy the obligation owed to Julia, without the need to sell the vacation home, the marital residence, or the tree farm, and without cashing in any retirement money.
As an additional matter, the trial court was entitled to take notice of Michael's receipt, in March, 1997, of a $38,114.00 bonus. According to the check stub that included the bonus, Michael put $4,711.43 of this money in a savings plan, purchased an additional $4,283.11 of stock, and received a net amount of $17,240.18. While a portion of the net amount included Michael's regular pay, the remainder could have been set aside, for example, to pay mortgage payments for a substantial period of time. Furthermore, although Michael claimed at trial that his cash flow situation was negative after deducting taxes, living expenses, and support, his own 1996 pay stub analysis shows nearly $2,000.00 per month in discretionary deductions, including stock purchases and 401(K) contributions. Michael's testimony was that he structured his discretionary pay in this manner because his employer match of 401(K) contributions doubled his own contribution and allowed him to make approximately $10,000.00 per year on this particular investment.
In view of these facts, as well as Michael's failure to reveal that he had received his bonus, the court was entitled to disregard Michael's claims of operating at a negative cash flow and to question his credibility. See, Tremaine,111 Ohio App.3d at 707 (noting that husband's concealment of income had seriously damaged his credibility). Likewise, we question the figures used in Michael's brief to argue the unreasonable nature of the combined child and spousal support. For example, Michael claims a deduction of $2,237.57 per pay period for child and spousal support, when the actual amount is only $2,193.70. This discrepancy appears to arise from the fact that the support figures in the trial court entry refer to monthly support amounts, while Michael receives 26 pay checks per year.
While the above mistake could be a simple math error, other arguments do not appear to be merely erroneous. In addition to the matters already mentioned, we note that Michael claims in his brief that an additional $313.97, or 6.66% of his pay is consumed each pay period for court-ordered deductions for health and life insurance. This fact is used to support the claim that the support award is inequitable because it not only deprives Michael of more than the percentage of income figured by the trial court, it also deprives him of the ability to meet daily living expenses.
However, this argument ignores two important points. First, the trial court did account for health care premiums by reducing Michael's child support obligation. Specifically, the child support worksheet indicates that $3,516.00 was paid for health insurance and Michael's support obligation was then reduced by that amount. Second, Michael's discussion on appeal fails to mention flexible spending credits given by his employer and the positive impact of those credits on his income.
The 1997 pay stub submitted to the trial court reveals a total of $338.48 in expenditures for items such as dental coverage, health care, disability, and life insurance. However, a credit of $202.92 is given, leaving a deduction per pay period at that time of $135.52 for all coverages, including Michael's owncoverage. Multiplying this amount by the number of pay periods per year (26), Michael's out-of-pocket expense for health-related coverage, including his own, is approximately $3,523.52, i.e., about six dollars more than the amount credited against Michael's support obligation by the trial court. The result is that between the health care credit against support given by the trial court and the flexible spending account, Michael's expense for court-ordered deductions is approximately six dollars per year.
Furthermore, the credit given by the trial court for health care premiums is probably in excess of what it should be, since Michael would need to provide for his own health coverage in the absence of an obligation to support his children. Therefore, the argument could be made that the trial court should have reduced the amount of the health premium credit on the worksheet by one-fourth.
As a final matter, we find no error in the trial court's refusal to impute income to Julia for purposes of computing child or spousal support. In this regard, Michael argues that Julia admitted in Exhibit M that she had potential income of approximately $23,000.00 per year. However, as we mentioned above, that exhibit was prepared by Michael and was given to his wife's attorney. Page 7 of the exhibit discusses Julia's 1987 income "baseline" of $11,391 and extrapolates from that an estimated 1995 salary of $23,563. However, neither Michael nor Julia testified about the computations of income, nor did either mention Julia's previous work history, other than noting that she left work in 1988 to spend more time with Michael and because of problem pregnancies.
In Rock v. Cabral (1993), 67 Ohio St.3d 108, the Court discussed imputed income, as follows:
 [I]n calculating and awarding child support, a trial court must consider the "potential income" as well as the gross income of a parent the court determines to be voluntarily unemployed or underemployed. The "potential income" to be imputed to such parent for purposes of calculating his or her support obligation is to be determined * * * by the parent's employment potential and probable earnings based on the parent's recent work history, job qualifications, and the prevailing job opportunities and salary levels in the community in which the parent resides.
Id. at 111. However, whether a parent is voluntarily unemployed is a matter for the trial court to decide, based on the facts of each case, and the decision is not to be disturbed absent an abuse of discretion. Id. at 108. We have previously emphasized that the welfare of the children is the prime consideration. Kooglerv. Koogler (July 18, 1997), Montgomery App. No. 16253, unreported.
After reviewing the record, we find no abuse of discretion in the trial court's decision not to impute income to Julia. While Julia worked as a secretary ten years ago, she has no recent work history, and the record is devoid of any evidence about prevailing job opportunities or salary levels in the community. Further, given the number of years Julia was absent from the workforce, some type of retraining would probably be needed. At trial, Julia expressed a desire to attend nursing school in order to prepare herself to support her children. She also said she started school, but quit due to the children's adjustment problems with the divorce. Under the circumstances and considering the welfare of the parties' small children, we find the court's decision reasonable. Compare, Shaffer, (1996), 109 Ohio App.3d 205
(finding court did not abuse discretion in declining to impute income).
Based on the preceding discussion, the third assignment of error is sustained in part and is overruled in part. As a result, the case will be remanded for recalculation of the amount of child support only, in accordance with this opinion.
 IV
In the fourth assignment of error, Michael contends that the court abused its discretion and decided against the weight of the evidence in awarding Julia spousal support for a period of six years. The trial court's decision in this regard was based on the young ages of the children, the lack of Julia's employment skills, and the need for three to four years of further education so that Julia could pursue a career in which she could adequately support the children. In addition, the court mentioned that it would be particularly hard for Julia to pursue a full-time education until the youngest child was at least in kindergarten. By contrast, Michael argues that the duration of the marriage was only seven and a half years, and that he supported his wife and children for two years after the separation, before the decree was filed. As a result, he claims that six years of additional support is excessive.
While six years is somewhat longer than we would have awarded, we cannot say the trial court acted unreasonably or arbitrarily. As we noted in Flexman v. Flexman (August 28, 1985), Montgomery App. No. 8834, unreported:
 Allowances for child support do not alone fill the bill when children are so young as to make employment outside the home by the custodian impossible, inappropriate, or if they create a condition below the level which such children have experienced. The issue in such cases is not how soon the custodian will readjust and become capable of earning an income; the question is when such spouse may do so under conditions that safely and adequately provide for the welfare of the children according to the standard that the parents have provided in the past.
In view of the young ages of the children, the fact that their mother has been a full-time homemaker since their birth, the relatively high standard of living enjoyed during marriage, and the amount of time needed by Julia for retraining, we cannot say the award of spousal support for six years is an abuse of discretion. Accordingly, the fourth assignment of error is overruled.
 V.
The fifth assignment of error is based on the contention that the trial court abused its discretion and decided against the weight of the evidence in awarding Julia a disproportionate share of the marital assets. In reviewing marital property division, we are limited to deciding "whether considering the totality of the circumstances, the trial court abused its discretion in fashioning the award." James, (1995), 101 Ohio App.3d 668, 680
(citation omitted). Although the starting point for splitting property is an equal division, the Ohio Supreme Court has also emphasized that "[t]he mere fact that a property division is unequal, does not, standing alone, amount to an abuse of discretion." Cherry v. Cherry (1981), 66 Ohio St.2d 348. See also, R.C. 3105.171(C)(1).
Upon examination of the record, however, we do not find that the award was unequal. In his brief, Michael claims that Julia received $180,367.00 in marital assets and that he received only $112,017.00, making the division of assets unequal. In response, Julia contends that the figures in Michael's brief add up to $123,917.00, not $112,017.00. Additionally, she argues that Michael omitted the marital assets he received in connection with the North Carolina vacation home.
The marital assets in Michael's brief are incorrectly added, and the correct figure is $123,917.00. In addition, we agree with Julia that the figures quoted in Michael's brief fail to include $56,450.00, which represents Michael's share of the marital assets invested in the North Carolina vacation home. Although the court found that the vacation home was separate property because it was purchased by Michael before marriage, the court also found that marital assets had been used to pay off a $68,000.00 mortgage on the property and to make approximately $44,900.00 in improvements to the property. Consequently, as part of the division of property, the court awarded Julia $56,450.00, representing one-half of the marital assets invested in the property. Inexplicably, Michael's brief fails to acknowledge this fact. When $56,450.00 is added to Michael's acknowledged $123,917.00 in assets, the resulting amount is $180,367.00, or exactly the same amount of marital assets awarded to Julia. Furthermore, even if this had not been the case, we would not have found an abuse of discretion in a greater award to Julia of marital assets, since Michael received as separate property an $80,303.00 bond fund, the $150,000.00 vacation home, and his interest in a tree-farm, valued at approximately $167,000.00.
Michael also argues that the award of 10% annual interest on the property division was inequitable. Again, we disagree. The parties agree on appeal that approximately seven months after the filing of the decree, Michael still had not paid Julia any of the marital assets that were awarded. Consequently, Michael continued to benefit from the income generated on all the investments. Further, as we noted above, more than sufficient assets existed for satisfying the award to Julia. Under the circumstances, we find no abuse of discretion in the division of property or in the award of interest.
 VI
In the sixth assignment of error, Michael claims that the trial court abused its discretion and decided against the weight of the evidence in determining that $140,000.00 of Michael's NCR 401(K) plan was accumulated during the marriage. On the amended pretrial statement, Michael listed the marital portion of the 401(K) plan as $103,851.00, but no testimony was received at trial about the value of the 401(K) account. Instead, the parties agreed to accept the calculations of their accountants on the value of all the retirement accounts, including the 401(K), the Pension Plus account, the NCR pension, and an IRA. Additionally, the parties agreed that they each were entitled to a one-half interest in the accounts, plus a share of the proportional growth to the time of distribution. Under the circumstances, the trial court erred in making a finding about the value of the 401(K) and ordering distribution of a specific amount.
The court did comment in its decision about the parties' agreement to arrive at the exact amount of the pension funds and interest. Given this agreement, the court also stated that if the parties could not agree, jurisdiction would be retained for an assessment hearing. Because the amounts of money in the various pension and retirement accounts is not subject to dispute, the parties should, on remand, stipulate to the amounts accumulated during marriage and to the amounts due each party based on the proportional growth in the accounts as of the date of distribution (which should be some time following remand). If the parties cannot agree, the trial court should set the matter down for an assessment hearing.
In light of the foregoing discussion, the sixth assignment of error is sustained only insofar as indicated, and this matter is remanded for further action on the division of pension and retirement benefits.
 VII
The seventh assignment of error is based on the contention that the trial court abused its discretion and decided against the weight of the evidence in determining that Michael must maintain all life insurance on his life unencumbered while, at the same time, ordering Michael to pay Julia one-half of the marital portion of the cash value. The total amount of this award was $11,900.00, and as we already noted, the value of the life insurance was taken into account in dividing marital property. Based on our previous discussion, we find no merit in Michael's contention that he has insufficient assets to pay this amount to Julia without encumbering his life insurance policies. Furthermore, the trial court did not abuse its discretion in ordering Michael to maintain the life insurance unencumbered until the emancipation of the youngest child. The purpose of such insurance is to protect the minor children by providing a source of funds in the unfortunate event of their father's death. If parties were allowed to borrow against insurance, the children's interests could be adversely affected. Accordingly, the seventh assignment of error is without merit and is overruled.
 VIII
In the eighth assignment of error, Michael claims that the trial court abused its discretion in ordering that Julia receive two-thirds of the household goods and furnishings. In making this award, the trial court relied on Frost v. Frost (1992), 84 Ohio App.3d 699,712, motion to certify overruled, (1993), 66 Ohio St.3d 1489. In Frost, the appellate court found that awarding the wife two-thirds of the household goods was not an abuse of discretion in light of the entire division of property. Again, given Michael's retention of significant assets as separate property, we cannot find that the trial court acted unreasonably, arbitrarily, or capriciously in giving Julia two-thirds of the household goods, particularly since the trial court exempted computers, vehicles, collections, and other high-value items. We also note that as in Frost, no evidence was presented about the value of the household goods. Accordingly, the eighth assignment of error is overruled.
 IX
In the ninth assignment of error, Michael claims that the trial court abused its discretion and decided against the weight of the evidence in not setting off as Michael's separate property (1) $18,000.00 of expenditures for improvements to the North Carolina property from Michael's non-marital funds and (2) $13,000.00 to pay off a second mortgage indebtedness on the marital residence from Michael's non-marital funds. In this context, Michael points to his own testimony that he used "passive income" from his separate property (the tree farm) to pay for improvements to the vacation home and a second mortgage of $13,000.00 on the marital residence. As a result, Michael argues that he should have been credited with these amounts as separate property.
In its decision, the trial court did not discuss income from the tree farm, but did conclude that the mortgage and improvements to the North Carolina property had been paid with marital funds. Regarding the marital premises, the court did not discuss improvements, but did find that Julia was entitled to one-half of the marital equity, after deduction for the mortgage at the time of separation and the $41,000 down payment that came from Michael's separate property. The total amount of Julia's equity in these two properties, as calculated by the trial court, was $90,025.00.
After reviewing the record, we find that the evidence submitted by Michael was contradictory and confusing. In his amended pretrial statement, Michael claimed he had made improvements to the marital home with separate funds in the amount of $13,000.00, and to the vacation home with separate funds in the amount of $18,000.00. After deducting these amounts, Michael listed the total marital equity in the marital home as $54,150.00, and the total marital equity in the North Carolina vacation home as $94,926.00.
By contrast, Michael testified during his first day of testimony that the fair market value of the vacation home was $150,000. He stated that a $68,000.00 mortgage on the vacation home was paid during the marriage with marital funds and that other expenses, including a $44,000.00 retaining wall for the vacation home, improvements (windows) for the marital home, and a recreational vehicle, were financed with a line of credit that had an upper limit of $50,000.00. According to Michael, as much as $82,000.00 flowed through this line of credit. Michael also testified, in direct response to a question from the trial judge, that both the mortgage and the $82,000.00 line of credit were paid from marital funds.
During the next day of trial, which took place several months later, Michael testified that he used tree farm income to pay off the lines of credit for the same improvements, i.e., the retaining wall for the vacation home and windows for the marital residence. At another point in the same hearing, he testified that he sold stock options accumulated during the marriage to pay off lines of credit that had been used for the retaining wall and windows. At no point were these discrepancies reconciled. Under the circumstances, the trial court was entitled to accept one of the versions of Michael's testimony and to conclude that marital funds were used to pay for the improvements to the properties. See, e.g., deLevie v. deLevie (1993) 86 Ohio App.3d 531, motion to certify overruled, 67 Ohio St.3d 1409 (finding that appellant failed to produce evidence indicating that payments for improvement of the marital residence were directly traceable to separate assets). Put another way, while Michael produced evidence that improvements were paid for with separate property, he also produced evidence that marital funds were used for the same improvements. Since the trial court was in a better position to assess credibility, we accept the factual findings of the court. Tremaine, (1996), 111 Ohio App.3d 703, 707.
Based on the preceding discussion, we find the trial court did not err in failing to credit Michael with sums allegedly expended for improvements on the vacation home and the marital premises. Accordingly, the ninth assignment of error is overruled.
 X
The tenth assignment of error is based on the trial court's alleged abuse of discretion in ordering Michael to pay 90% of Julia's attorney fees. Although evidence was presented that the attorney fees amounted to approximately $39,801.80, the trial court did not enter judgment for a particular amount of attorney fees. Instead, the court ordered that if the parties could not agree on the amount of fees, a hearing would be held pursuant toSwanson v. Swanson (1976), 48 Ohio App.2d 85. According to the parties, no hearing has been held because Julia changed counsel after trial.
R.C. 3105.18 (H) provides for awards of reasonable fees in divorce proceedings if the court "determines that the other party has the ability to pay the attorney's fees that the court awards." As a prerequisite for awarding fees, the statute further requires the court to "determine whether either party will be prevented from fully litigating that party's rights and adequately protecting that party's interests if it does not award reasonable attorney's fees." Moreover, "[a]ppellate review of attorney fee awards is limited to determining whether (1) the factual considerations upon which the award was based are supported by the manifest weight of the evidence or (2) the domestic relations court abused its discretion. Neel v. Neel (1996), 113 Ohio App.3d 24,34, discretionary appeal not allowed (1997), 77 Ohio St.3d 1514
(citation omitted).
In this case, the trial court made the specific findings required by R.C. 3105.18. Among the factual considerations found pertinent by the trial court was the fact that Michael had the use of the bulk of the parties' marital assets throughout the litigation and had been able to pay his own counsel fees from those assets and his own superior income. The court observed that the use of marital funds by the economically advantaged spouse for his own attorney fees could be considered financial misconduct. As a result, the court found Julia would be denied her right to fair representation absent an award of attorney fees.
After reviewing the record, we find that the trial court's ruling was an abuse of discretion. First of all, it is not precisely true that Michael had the use of the bulk of the assets during litigation. It is true that Michael sold marital stock just before filing for divorce and realized between $115,423.00 and $124,683.00. This money was used to pay off lines of credit, to make prepayments of the mortgage on the marital residence, and to pay other expenses, including some minor expenses of the wife such as her credit card debt and appliance replacement. However, just after the divorce was filed, a restraining order was granted, which prohibited Michael from further disposing of assets, including the stocks and bond funds. Julia was also awarded temporary attorney fees of $1,000.00 on October 3, 1995. An agreed entry was then filed on October 27, 1995, in which that the parties stipulated that Julia would receive $5,564.82 from an income tax refund check, to be used for attorney fees. Therefore, Julia was not without access to some funds during litigation.
What we think the trial court was disturbed about were the inconsistencies in Michael's testimony and his incomplete accounting for the funds that were converted before the divorce was filed. Additionally, as was mentioned earlier, Michael concealed his receipt of a substantial bonus during the divorce proceedings. Not only did this reflect poorly on Michael's credibility, he could also have used that money to pay his own attorney fees. A further factor in the court's thinking may have been that Michael had a substantial tax refund deposited to his own account during the divorce proceedings, without giving his wife any of the money. And finally, for the vast portion of the litigation, Julia's annual income for herself and three children, including temporary child and spousal support, was approximately $30,086.00. During the same period of time, Michael's income in 1995, including salary and bonus alone (and deducting for spousal and child support, but not taxes) was approximately $111,063.00. Similarly, in 1996, his income was $97,757.00. Thus, while Michael was not able to use marital assets such as the bond funds during litigation, it does appear that he had a substantially greater income from which to pay attorney fees.
Given the above facts, we have no particular quarrel with the trial court's factual basis for awarding attorney fees, although we think a 90% award is excessive in light of the large amount of the fees and the substantial assets awarded to Julia. Instead of being based on the weight of the evidence, our conclusion that the trial court abused its discretion hinges primarily on the fact that Michael was not given a sufficient chance to litigate the issue. For example, when Julia's counsel began to question Julia at trial about attorney fees, Michael's attorney expressed surprise and asked the court if the hearing that day was intended to be for attorney fees. Michael's attorney then said he wanted to cross-examine Julia at length on the issue, and noted there was not time to do so that day. In response, Julia's counsel suggested that the cross-examination could be done later. At that time, the court also assured Michael's attorney that a separate hearing on fees would be scheduled. As a result, Michael's attorney did not ask any questions related to fees. Under the circumstances, we believe the court should have waited until after a separate hearing to make a decision on the percentage of fees, if any, to be awarded. As a result, we believe this matter needs to be remanded for further hearing on the need for fees and the amount, if any, to be awarded.
Based on the preceding discussion, the tenth assignment of error is sustained and the issue of attorney fees is remanded for further hearing.
 XI
The final assignment of error relates to an ex parte order issued by Visiting Judge Meager on May 21, 1997. In the order, Michael was prohibited from disclosing the children's medical records to third parties. Because of the ex parte nature of the order, the record does not contain specific information about why the order was needed. Michael claims the order was an abuse of discretion because he was given no prior notice before the order was filed. He further contests the order because it denies him the ability to provide Dr. Painter with information needed for counseling the family members. Apparently, Dr. Painter has been appointed to aid the parties in their relationship with their children.
In responding to this assignment of error, Julia first contends that the order is not a final, appealable order. Second, she states that she has no objection to the issue being remanded. In view of Julia's lack of objection to a remand, we will remand the issue for further hearing on the trial level. Assuming for sake of argument that the order was properly issued, the remedy is in the trial court, where a hearing can be held. See, Civ.R. 75(H), and Local R. 4.23 of the Court of Common Pleas of Montgomery County, Domestic Relations Division. Accordingly, the eleventh assignment of error is sustained and the issue of the exparte order is remanded for further hearing.
In view of the foregoing discussion, the third assignment of error is sustained in part and overruled in part, and the sixth, tenth, and eleventh assignments of error are sustained. The remaining assignments of error (first, second, fourth, fifth, seventh, eight, and ninth) are overruled. This case is remanded for further proceedings consistent with this opinion.
YOUNG, P.J., and WOLFF., J., concur.
Copies mailed to:
Charles D. Lowe
L. Anthony Lush
Hon. V. Michael Brigner